IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NORMAN VIGIL,

     Plaintiff,

v.                                        No. 1:16-cv-00047 KG/KK

NEW MEXICO PUBLIC EDUCATION DEPARTMENT,

     Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendant's motions for summary judgment and Plaintiff's motion for partial summary judgment. On January 16, 2017, Defendant filed "Defendant's Motion for Summary Judgment Regarding Plaintiff's Claims of Disability Discrimination and Retaliation Based on the ADAAA and HRA [Count I and III] and his Common Law Claim of Constructive Discharge ['Primary Summary Judgment Motion']" ("Defendant's First Motion for Summary Judgment") (Doc. 84), and "Defendant's Motion for Summary Judgment Regarding Plaintiff's Claims of Sex Discrimination [Counts II and III] and Retaliation Based on The Whistleblower Protection Act [Count IV] ['Second Motion for Summary Judgment']" ("Defendant's Second Motion for Summary Judgment") (Doc. 86). On January 18, 2017, Plaintiff filed "Plaintiff's Motion and Memorandum for Partial Summary Judgment that his Employer-Caused Disability Does Not Cut off Back or Front Pay" ("Plaintiff's Motion for Partial Summary Judgment"). (Doc. 89). The motions are completely briefed. (Docs. 85, 87, 98, 101, 102, 108, 114, and 115).

The Court conducted a hearing on March 27, 2018, in which it briefly explained its reasons for granting, in part, and denying, in part, Defendant's First Motion for Summary

Judgment; granting Defendant's Second Motion for Summary Judgment; and denying Plaintiff's Motion for Partial Summary Judgment. The Court also entered an Order on March 27, 2018, noting its tentative ruling. (Doc. 127). This Memorandum Opinion and Order constitutes the full written opinion mentioned at the hearing and in the Order.

## I.  Procedural Background

### A.  Plaintiff's Amended Complaint

Plaintiff filed his First Amended Complaint for Damages for Discrimination and Retaliation ("Amended Complaint") on May 4, 2016. (Doc. 33). In his Amended Complaint, Plaintiff pleaded five causes of action against Defendant: "Violations of the ADA" ("Count I"), "Violations of Title VII" ("Count II"), "Violations of the HRA" ("Count III"), "Violations of the WPA" ("Count IV"), and "Constructive Discharge" ("Count V"). *Id.*

### B.  Defendant's First Motion for Summary Judgment

In its First Motion for Summary Judgment, Defendant contends that it is entitled to summary judgment on Plaintiff's ADA and NMHRA failure to accommodate claims because Plaintiff cannot prove a disability under the ADA. (Doc. 85) at 22. Additionally, Defendant argues that Plaintiff cannot prove the remaining elements of his *prima facie* failure to accommodate case, and that Defendant did everything it could to reasonably accommodate Plaintiff. *Id.* at 22-27. Defendant also argues that Plaintiff has no claim for constructive discharge. *Id.* at 26-27, 31-36.

In response, Plaintiff asserts that summary judgment is improper because Plaintiff can establish a *prima facie* failure to accommodate case, and, further, his requested accommodations were reasonable. (Doc. 101) at 16-25. Plaintiff also argues there is a genuine issue of material fact regarding whether he was constructively discharged. *Id.* at 25-27.

2

## C. *Defendant's Second Motion for Summary Judgment*

In its Second Motion for Summary Judgment, Defendant asserts it is entitled to summary judgment on Plaintiff's Title VII and NMHRA sex discrimination claims. (Doc. 87) at 6. Specifically, Defendant argues that Plaintiff, a male, cannot show that Defendant treated him differently from similarly situated female employees. *Id.* at 12-14. In addition, Defendant argues it is entitled to summary judgment on the New Mexico Whistleblower Protection Act ("NMWPA") claim because Plaintiff cannot show a causal connection between Plaintiff's protected activity and Defendant's alleged retaliation. *Id.* at 14-16. In response, Plaintiff argues that he can show both that he was treated differently from similarly situated female employees and can establish a *prima facie* case of sex discrimination. (Doc. 102) at 9-12. Plaintiff further asserts that there is evidence demonstrating a causal connection between Plaintiff's protected activity and Defendant's retaliatory actions. *Id.* at 12-22.

## D. *Plaintiff's Motion for Partial Summary Judgment*

In Plaintiff's Motion for Partial Summary Judgment, Plaintiff argues there is no genuine issue of material fact concerning whether Defendant caused his disability and, thus, he had no duty to mitigate his damages. (Doc. 89) at 8-13. In its response, Defendant argues Plaintiff's motion is premature and that there are genuine issues of material fact regarding whether Plaintiff is disabled and, even if Plaintiff is disabled, a genuine question of fact exists as to whether Defendant caused the disability. (Doc. 98) at 19-28.

## II. Factual Background[1]

### A. Facts Relevant to Failure to Accommodate Claims and Constructive Discharge

Plaintiff worked for Defendant for over seventeen and a half years. (Doc. 89-14) at 2. At the time relevant to this litigation, November 2010, to January 2, 2015, when he resigned, Plaintiff worked as an Information Technology ("IT") Systems Manager IV. *Id.*; (Doc. 85-1) at 25 (depo. at 26). Plaintiff, his supervisor and Defendant's Chief Information Officer, Michael Archibeque, and Plaintiff's IT coworkers worked in the Jerry Apodaca Building ("Apodaca Building"). (Doc. 85-1) at 12, ¶ 11.

On November 10, 2010, Plaintiff reported to Annette Larkin, Defendant's Human Resource Administrator, that he became ill on November 1, 2010. *Id.* at 52-54. Plaintiff reported he was experiencing headaches, burning eyes, sinus issues, and that he was unable to focus due to a chemical smell in his office. *Id.* At the time of his illness, Plaintiff was working in the basement, Room G-5, of the Apodaca Building. *Id.* at 7, ¶ 6; *id.* at 11, ¶ 5; (Doc. 89-1) at 3. Defendant took steps after November 2010 to remediate the basement, including the installation of a new ventilation system and the removal of any mold and water leaks in the basement bathrooms. (Doc. 85-1) at 2, ¶¶ 5-6. During the remediation, Defendant discovered asbestos in the tile layer underneath the carpeting of the "G-5 server room." *Id.* at ¶ 7. By April 1, 2013, Defendant had removed the asbestos completely. *Id.*

After Plaintiff made his November 2010 report, Defendant moved Plaintiff and his coworkers from the basement to an office on the third floor of the Apodaca Building, which provided windows that Plaintiff opened. (Doc. 89-1) at 3; (Doc. 89-2) at 4 (depo. at 16). Plaintiff and his coworkers worked in this office from December 2010 through November 2011.

---

[1] Unless otherwise noted, the following summary of material facts is undisputed.

(Doc. 89-1) at 3; (Doc. 89-2) at 5 (depo. at 44). Plaintiff took leave in October 2011, receiving worker's compensation.[2] (Doc. 85-1) at 8, ¶ 10. After Plaintiff returned from leave in November 2011, Defendant moved Plaintiff into Room 205 of the Apodaca Building, an office on the second floor where he had access to a window. (Doc. 89-2) at 5 (depo. at 42-43).

Plaintiff worked in this office from November 2011 through February 2014. (Doc. 89-1) at 3. Plaintiff kept the windows open when he worked in Room 205, pursuant to a doctor's recommendation that he get fresh air. (Doc. 89-2) at 4-5 (depo. at 16, 42-45). Plaintiff found Room 205 to be acceptable because of the fresh air. *Id.* at 5 (depo. at 44). Furthermore, Mr. Archibeque recognized that when Plaintiff had access to fresh air, Plaintiff did his work well. (Doc. 85-1) at 27 (depo. at 63-64).

Additionally, from November 2011 through April 2014, Plaintiff saw several doctors who provided him with "Doctor Visit/Modified Work Assignment" forms from the New Mexico Risk Management Division ("NMRMD"). (Doc. 85-1) at 55-59, and 62. Each form details Plaintiff's medical diagnosis as "chemical exposure," and restricts Plaintiff from future exposure to the basement or "contaminated area" in the Apodaca Building. (Doc. 85-1) at 55-59, and 62. As instructed, Plaintiff returned these forms to Defendant. *Id.*; (Doc. 89-2) at 3-6 (depo. at 6-9, 16-17, and 45-49).

Plaintiff saw several other medical professionals about his illness. (Doc. 89-3) at 7-8. Among the medical professionals was clinical health psychologist, Dr. Paul Donovan,[3] who, on

---

[2] The reason for this leave remains unclear but not material to the issues at hand. (Doc. 85-1) at 8, ¶ 10.

[3] According to his affidavit, Dr. Donovan is a retired clinical health psychologist who was licensed in the State of New Mexico from 1998 to 2016. (Doc. 89-6) at 2-3, ¶¶ 2-3. In his affidavit, Dr. Donovan states he had "specialized in the treatment of chronic functional disorders, as well as post-traumatic rehabilitation methodologies across a spectrum of situations ranging

or about April 9, 2012, diagnosed Plaintiff "as suffering from Cognitive Disorder, not otherwise specified ('NOS'); chronic [post-traumatic stress disorder ('PTSD')]; Major Depressive Disorder, severe with psychotic features; Somatoform Disorder; Pain Disorder associated with psychological factors and a medical condition; Panic Disorder; and Impulse Control Disorder, NOS." (Doc. 89-6) at 4, ¶ 8. In his affidavit, Dr. Donovan attests that Plaintiff's "PTSD, and his decompensation episodes, were caused, or at least greatly exacerbated by, events at work." *Id.* at 5, ¶ 12. Moreover, Dr. Donovan notes that the "traumata and PTSD that [Plaintiff] suffered was triggered by the onset of physiological symptoms that he began to experience in the fall of 2010." *Id.*

In late February 2014, Plaintiff and the whole IT team moved back to the basement of the Apodaca Building—Room G-15. (89-1) at 3; (Doc. 102-1) at 3. Plaintiff agreed to the move after Mr. Archibeque told Plaintiff on a daily basis that Plaintiff was not a "team player" because he would not join the IT team in the basement.[4] (Doc. 89-2) at 7 (depo. at 90-91). Plaintiff talked to his doctors about the move and with their permission he decided to move to Room G-

_____

from motor-vehicle accidents to dog-bites to nuclear radiation exposure, in close cooperation with my medical colleagues, including neurologists, neurosurgeons, physiatrists, endocrinologists, etc., often arising in a work-related, occupational context." *Id.* at 2, ¶ 2. As a clinical health psychologist, he states he has "enhanced familiarity with basic anatomy, physiology, and medical disorders as compared with general-practice clinical psychologists, but with a primary focus on traumatology." *Id.* at 3, ¶ 3.

[4] Plaintiff contends he was "pressured" by Mr. Archibeque to return to the basement. (Doc. 89-3) at 6. Defendant argues that emails from Kenneth Giles, Defendant's Human Resource Manager, refute that Mr. Archibeque pressured Plaintiff into moving back to the basement. *See* (Doc. 114) at 5. An email from Mr. Giles to Charlene Urban of NMRMD, on February 25, 2014, explains Plaintiff would be moving to Room G-15, and an email from Mr. Giles to Plaintiff, on the same day, indicates that Mr. Archibeque informed Mr. Giles of Plaintiff's request to be moved with the other IT workers to Room G-15 and of the need for a release from Plaintiff's doctor to make that move. (Doc. 85-1) at 60-61. The Court does not view these emails as inconsistent or contradictory to Plaintiff's position that he was "pressured" into moving to Room G-15 in the basement of the Apodaca Building.

15 in the basement. *Id.* at 7 (depo. 91-92). On February 25, 2014, Plaintiff provided Mr. Giles with doctors' orders approving the move to the basement of the Apodaca Building. (Doc. 85-1) at 60.

Plaintiff stayed in the basement for a few days in late February until his doctors requested he be moved because he "started feeling uneasy" and "got sick." (Doc. 89-2) at 7 (depo. at 90-92); (Doc. 85-1) at 67 (depo. at 51). Plaintiff informed Mr. Archibeque of his illness,[5] and Defendant then moved Plaintiff in early March 2014 to the second floor of the Apodaca Building into Room 236. (Doc. 89-2) at 7-8 (depo. at 93-94). Unlike Room 205, Plaintiff did not have access to fresh air through open windows in Room 236,[6] a situation which Plaintiff asserted negatively affected his health. *Id.* at 8 (depo. at 94-95).

On April 21, 2014, Plaintiff requested by letter and email to move from Room 236 to another office in the Apodaca Building or in the Defendant's North Building. (Doc. 89-8) at 4. In his request, Plaintiff provided statements from Dr. Donovan and Dr. Belyn Schwartz,[7] both of whom recommended Defendant move Plaintiff to the North Building. *Id.* at 5-6. This information was emailed to Mr. Giles and copied to Mr. Archibeque. *Id.* at 2-6. *Id.* at 2-6. On April 25, 2014, Plaintiff supplemented his request with a note from another of his doctors, Dr.

---

[5] It is unclear when Plaintiff informed Mr. Archibeque. In answering an interrogatory, Plaintiff noted he worked in Room 236 from March 2014 through October 2014. (Doc. 89-1) at 3.

[6] Hipolito "Paul" Aguilar, Defendant's Deputy Secretary for Finance and Operations, stated Defendant had always provided Plaintiff with an office near windows where Plaintiff had access to fresh air. (Doc. 85-1) at 79 (depo. at 90). However, Defendant does not provide facts to dispute Plaintiff's deposition testimony that while Room 236 may have had windows, it was a large space and Plaintiff was not stationed near a window. (Doc. 85-1) at 48 (depo. at 94-95); (Doc. 89-2) at 9-10 (depo. at 101-102). In fact, Mr. Archibeque stated there were no windows in Room 236 where Plaintiff was working. (Doc. 108-2) at 3 (depo. at 83). Viewing the evidence in a light most favorable to Plaintiff, the Court finds that Plaintiff did not have access to fresh air through open windows in Room 236.

[7] According to Plaintiff, Dr. Schwartz was his physiatrist. (Doc. 89-3) at 8.

Anthony Holzgang, a staff psychiatrist at Christus, St. Vincent. (Doc. 89-9) at 5. Dr. Holzgang concurred with Drs. Donovan and Schwartz, noting that Plaintiff's move back to the basement in February 2014 negatively affected Plaintiff and that Plaintiff should be assigned to a different building. *Id.*

On May 9, 2014, Mr. Aguilar sent Plaintiff a letter denying Plaintiff's request to move to the North Building. (Doc. 89-10) at 2-3. Mr. Aguilar later testified that he could not make a decision on Plaintiff's request until an independent medical examination ("IME") was completed. (Doc. 85-1) at 78 (depo. at 88-89). Ms. Urban requested an IME in 2013 to assist her in handling Plaintiff's workers' compensation claim. (Doc. 102-6) at 2 (depo. at 16-17); *id.* at 4 (depo. at 31).

After being denied his request to move from Room 236, Plaintiff took paid leave from June 5, 2014, through August 29, 2014. (Doc. 85-1) at 8, ¶ 10. During his leave, Plaintiff received a positive employee evaluation, indicating he met or exceeded performance standards across several areas. (Doc. 85-1) at 32-39. Plaintiff returned to work in Room 236 in late August 2014. *Id.* at 8, ¶ 10.

On October 9, 2014, a member of the IME panel, which was still conducting its analysis, informed Ms. Urban that Plaintiff needed to be removed from the Apodaca Building immediately. *Id.* at 83 (depo. at 26); *id.* at 85. That same day, Ms. Urban informed Mr. Giles, *id.* at 83 (depo. at 26-27), who in turn instructed Plaintiff to leave the Apodaca Building for health reasons. *Id.* at 69-70 (depo. at 97-98). Mr. Giles also informed Mr. Archibeque and Mr. Aguilar of Plaintiff's need to leave the Apodaca Building. *Id.* at 70 (depo. at 99). Plaintiff went home that day and Defendant placed him on workers' compensation leave. *Id.*

On October 13, 2014, Plaintiff filed for Disability Retirement Benefits through the Public

Employees Retirement Association of New Mexico ("PERA"). *Id.* at 102-103. In his

application, Plaintiff stated he was totally and permanently disabled, and that the nature of his

condition included: "[PTSD], Major Depressive Disorder, Panic Disorder, Neurotoxic Disorder,

Anxiety, fatigue, Parethesias, Ataxia, Sleep Disorder, Carpal Tunnel, Arm and leg pain." *Id.* at

102. Plaintiff asserted his condition was a result of his job, explaining that it stemmed from

exposure to "multiple chemicles [sic], black mold, low level of oxygen and questionable

exposure to asbestos." *Id.* Plaintiff noted he could not work because he was "unable to focus,

anxeity [sic], depression, fatigue, chemical sensitivity, headaches, physical issues." *Id.*

The next day, October 14, 2014, Plaintiff was admitted to Christus St. Vincent

Psychiatric Unit, for severe depression and suicidal ideations. (Doc. 89-3) at 8. Dr. Donovan

attested that Defendant's May 2014 refusal to move Plaintiff to another office and to leave

Plaintiff in "an isolated, windowless office … set him up to be further destabilized by a process

of sensory deprivation and isolation." (Doc. 89-6) at 6, ¶ 15. Dr. Donovan further noted that

because Plaintiff did not work in another location, Plaintiff "suffered a severe setback and

worsening of his mental status," that culminated in the October 2014 "'mini-breakdown'

(personality disorganization) requiring hospitalization." *Id.* at ¶ 17.

On December 11, 2014, Plaintiff was notified that the PERA Disability Review

Committee approved a one year disability retirement pension, finding Plaintiff's disability to be

"duty related." (Doc. 85-1) at 104-107. On December 15, 2014, Plaintiff then filed an initial

claim for disability with the Social Security Administration ("SSA"), claiming the same

conditions he listed in his PERA disability application. *Id.* at 89-96.

Plaintiff resigned effective January 2, 2015, asserting health issues. (Doc. 89-14) at 2. Plaintiff was on workers' compensation leave from October 10, 2014 through January 2, 2015. (Doc. 85-1) at 8. Plaintiff did not seek other employment because his mental condition prevented him from concentrating. (Doc. 89-3) at 12. Additionally, Plaintiff expressed that when Defendant decided to place him on workers' compensation leave rather than allow him to move to the North Building he was left "with the conclusion that [Defendant] did not want me working there anymore." *Id.* at 11.

Dr. Warren M. Steinman, Ph.D., reported on May 29, 2015, that Plaintiff is disabled for purposes of SSA disability, and "Medical Improvement not Expected." (Doc. 85-1) at 96. In a separate letter, SSA noted that Plaintiff "was found disabled for the following reasons [sic] disorders of back (discogenic & degenerative) and anxiety disorders." (Doc. 114-1) at 16. In a letter dated September 19, 2015, SSA found Plaintiff to be disabled under its rules as of June 5, 2014. (Doc. 85-1) at 107.

### B. *Facts Relevant to Sex Discrimination Claims*

Plaintiff asserts that Defendant allowed other employees to move offices during 2013 and 2014. For example, Defendant allowed Donna Intriere to work from home two days per week for a ninety-day period because of a personal issue.[8] (Doc. 87-1) at 9-10 (depo. at 111-116). Ms. Intriere otherwise worked in the North Building. *Id.* at 10 (depo. at 114-115). In 2014, Defendant allowed another female employee, Rachel Stofocik, to work from home because of her concerns about air quality in the Apodaca Building. *Id.* at 8 (depo. 107-108). However, Mr. Aguilar did not approve Ms. Stofocik's request to work from home and required her to return to work in the Apodaca Building. *Id.* When Ms. Stofocik requested a move to another building,

---

[8] It is unclear when Ms. Intriere was allowed to work from home.

Mr. Aguilar denied her request, and she subsequently resigned. *Id.* at 9 (depo. at 110). In the summer of 2014, Mr. Aguilar did approve a temporary office move for Miriam Moorhouse from the Apodaca Building to the North Building. *Id.* at 10 (depo. at 116-117). Mr. Aguilar approved Ms. Moorhouse's request to move because work done in the hallways had inflamed her asthma. *Id.* at 11 (depo. at 118-119). Ms. Moorhouse was not in the North Building for longer than a week. *Id.* at 10 (depo. at 117). Mr. Aguilar also noted in his deposition testimony that there was space for Ms. Moorhouse at the North Building in the summer of 2014. *Id.* at 11 (depo. at 118).

### C. Facts Relevant to NMWPA Retaliation Claim

In September 2013, the Communications Workers of America ("CWA"), of which Plaintiff was a member, filed a case against Defendant regarding air quality in the basement of the Apodaca Building. (Doc. 85-1) at 3, ¶ 12. Plaintiff "agreed to be the chief witness for the CWA in their lawsuit to prevent the forced move of employees back to the basement," and he signed an affidavit under oath on behalf of the CWA that was filed in the First Judicial District Court. (Doc. 87-1) at 5.

On April 25, 2014, Mr. Giles informed Plaintiff that Defendant's General Counsel and the NMRMD needed Plaintiff's doctor statements to decide whether to grant his request. (Doc. 89-9) at 2-3; (Doc. 102-8) at 2-3 (depo. at 73-74).

In his May 9, 2014, letter denying Plaintiff's request to move from Room 236, Mr. Aguilar noted that Defendant consulted with the NMRMD, which in turn consulted with Plaintiff's workers' compensation attorney, "and the parties involved agreed" it would be best to deny Plaintiff's request—leaving him in Room 236. *Id.* at 2. Mr. Aguilar, therefore, concluded that a move to the North Building "was not warranted." *Id.* at 2. Additionally, Mr. Aguilar noted that Defendant had worked with Plaintiff to meet "the restrictions recommended by your

doctors and still be able to meet operational business needs." *Id.* at 3. Mr. Aguilar concluded

that "it is not operationally feasible to locate your work station at the North Building." *Id.* Mr.

Aguilar's letter did not discuss whether Defendant could move Plaintiff to another office in the

Apodaca Building or other accommodations. *See id.* at 2-3.

III.     *Standard of Review*

Summary Judgment is appropriate if there is no genuine dispute as to a material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When

applying this standard, the Court examines the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment. *Applied*

*Genetics Intl, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The

moving party bears the initial burden of showing there is no genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the non-movant to

come forward with evidence showing a genuine issue of material fact. *Bacchus Indus., Inc. v.*

*Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a

reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212

(10th Cir. 1996) (citation omitted). The non-moving party may not avoid summary judgment by

resting upon mere allegations or denials of his or her pleadings. *Bacchus, Indus., Inc.*, 939 F.2d

at 891.

*IV.   Discussion*

### A. *Plaintiff's Claims for Failure to Accommodate Under the ADA and NMHRA*[9]

To show a *prima facie* case for failure to accommodate under the ADA and NMHRA,

Plaintiff must show that: "(1) [he] is disabled; (2) [he] is 'otherwise qualified'; and (3) [he]

requested a plausibly reasonable accommodation." *Punt v. Kelly Services*, 862 F.3d 1040, 1050

(10th Cir. 2017) (citation omitted).

"Once the employee produces evidence sufficient to make a facial showing on his or her

*prima facie* case, the burden of production shifts to the employer to present evidence either (1)

conclusively rebutting one or more elements of plaintiff's *prima facie* case or (2) establishing an

affirmative defense, such as undue hardship or one of the other affirmative defenses available to

the employer." *Punt*, 862 F.3d at 1050 (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154,

1179 (10th Cir. 1999)).  "If the employer does either of the above, summary judgment will be

appropriate for the employer unless the employee then presents evidence establishing a genuine

dispute regarding the affirmative defenses and/or rehabilitating any challenged elements of his or

her prima facie case sufficiently to establish at least a genuine dispute of material fact as to such

challenged elements." *Punt*, 862 F.3d at 1050 (citing *Smith*, 180 F.3d at 1179).

A person has a disability under the ADA if she "has a physical or mental impairment that

substantially limits one or more . . . major life activities."  42 U.S.C. § 12102(1)(A) (2000)

(amended 2008); 29 C.F.R. § 1630.2(g) (2011).  After the Supreme Court's ruling in *Toyota*

*Motor Manufacturing v. Williams*, 534 U.S. 184, 198 (2002), holding "major life activities"

---

[9] The Court analyzes the NMHRA claims using the ADA analysis.  *See Trujillo v. Northern Rio Arriba Electric Coop., Inc.,* 2002-NMSC-004, ¶ 8, 131 N.M. 607 (applying requirements for *prima facie* case for discrimination under ADA to plaintiff's NMHRA claim of discrimination based on disability); *see also Brown v. McGill*, 2010 WL 1779035, at *5 n.3 (D.N.M.) (relying upon federal law interpreting ADA to analyze failure to accommodate claims under NMHRA).

referred only to activities of "central importance to most people's daily lives", Congress amended the ADA. Pub. L. No. 110-325 § 2(b)(4). In so doing, Congress stated that the "question of whether an individual's impairment is a disability under the ADA should not demand excessive analysis" and "usually will not require scientific, medical, or statistical analysis." Pub. L. No. 110-325 § 2(b)(5); 29 C.F.R. § 1630.2(j)(v). Further, "[a]n impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." 42 U.S.C. § 12102(4)(C).

The ADA as amended, now specifies, "major life activities include, but are not limited to, caring for oneself, . . . sleeping, walking, . . . lifting, bending, . . . concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Additionally, major life activities encompass major bodily functions "including but not limited to, functions of the . . . digestive [system] . . . [and] brain [function] . . . ." *Id.* at § 12102(2)(B).

The Equal Employment Opportunity Commission has promulgated regulations providing guidance in interpreting what is a disability under the ADA. Specifically, "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i). "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Id.* at § 1630.2(j)(1)(ii). The determination of whether a mental or physical impairment substantially limits a major life activity "requires an individualized assessment." *Id.* at § 1630.2(j)(1)(iv). Some physical and mental impairments "will, at a minimum, substantially limit" major life activities. *See* 29 C.F.R. § 1630.2(j)(3)(iii). For example, section 1630.2(j)(3)(iii) specifically suggests that PTSD and major depressive disorder substantially limit brain function, a major

bodily function. Finally, "whether [an] impairment substantially limits a major life activity is ordinarily a question of fact for the jury." *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003)).

Plaintiff has provided evidence showing that his mental impairments, PTSD and major depressive disorder, substantially limit the major life activities of concentrating and thinking. First, Plaintiff offers his statements that he has been unable to care for himself and that his psychological conditions affect his ability to concentrate, think, communicate with others, and multitask. (Doc. 89-3) at 3-4; (Doc. 85-1) at 91-92. Second, Plaintiff provides his wife's deposition testimony that after his exposure in the basement at the Apodaca Building he no longer can help out around the house, and he cannot multitask as well as he could before. (Doc. 101-6) at 3 (depo. at 20-21); *id.* at 5 (depo. at 32-33). Plaintiff's wife noted that now Plaintiff can only focus on one thing at a time now. *Id.* at 5 (depo. at 32-33). Third, Plaintiff offers statements from his treating psychologist, Dr. Donovan, who attests that Plaintiff reported many difficulties, including difficulties learning, multitasking, controlling his impulses, and working. (Doc. 89-6) at 4, ¶ 9. In addition, Dr. Donovan noted that Plaintiff suffered from suicidal ideation, headaches, and general anhedonia ("meaninglessness"). *Id.* Dr. Donovan also states that an individual like Plaintiff, with PTSD, who is re-traumatized, may experience long-term effects on his mental health. *Id.* at 6, ¶ 16. A reasonable jury, viewing this evidence in the light most favorable to Plaintiff, could find that Plaintiff's PTSD and major depressive disorder substantially limit major life activities.

Additionally, Plaintiff has provided evidence demonstrating that his PTSD and major depressive disorder substantially limit his brain function—a major bodily function. *See* 29

C.F.R. § 1630.2(i)(1)(ii). A reasonable jury could find, based on Plaintiff's statements, Plaintiff's wife's deposition testimony, and Dr. Donovan's report on the impact of Plaintiff's PTSD, that Plaintiff's PTSD substantially impaired his brain function. Furthermore, the Court is guided by 29 C.F.R. § 1630.2(j)(3)(iii), which provides that PTSD and major depressive disorder, "at a minimum," substantially limit brain function. Similar to the conclusion regarding major life activities, a reasonable jury could find that Plaintiff's PTSD and major depressive disorder substantially limit his brain function, a major bodily function.

Finally, the Court concludes a reasonable jury could also find that Plaintiff's limitations are different from the general population. Dr. Donovan's statements regarding Plaintiff's feeling of powerlessness, helplessness, and suicidal ideations indicate an effect on Plaintiff that is not shared by the general population. Thus, the Court finds that Plaintiff has shown the existence of a genuine issue of material fact as to whether he is disabled. The evidence includes that his mental impairments of PTSD and major depressive disorder substantially limit the major life activities of thinking and concentrating and limit brain function, a major bodily function. Therefore, Plaintiff has satisfied the first element of his *prima facie* case.

As to the second element, the Court considers two criteria to determine whether Plaintiff has shown he is a qualified individual. "First, . . . whether [his] impairment prevented [him] from performing the essential functions of [his] job." *Robert v. Bd. of Cty. Comm'rs*, 691 F.3d 1211, 1216 (10th Cir. 2012) (citation omitted). "If so, . . . then . . . whether [he] might have nevertheless been able to perform those functions if [Defendant] provided [him] a reasonable accommodation." *Id.* (citation omitted). "Determining whether a particular function is essential is a factual inquiry." *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (citation omitted).

Importantly, a plaintiff cannot create a genuine issue of material fact regarding an essential function if the employer provides evidence of an essential function and the plaintiff merely provides his deposition testimony to the contrary. *See Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (noting "[reluctance] to allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience"). In essence, the Court does not sit "as a super personnel department that second guesses employers' business judgments." *Id.* (citing *Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)) (quotation marks omitted). "We weigh heavily the employer's judgment regarding whether a job function is essential." *Hennagir*, 587 F.3d at 1262 (citing *Mason*, 357 F.3d at 1119).

Plaintiff was employed as IT Systems Manager IV, as of May 9, 2014, when Mr. Aguilar denied his request to move from Room 236. According to Defendant's job description, the job included supervisory responsibilities. (Doc. 85-1) at 14-18. Mr. Archibeque described Plaintiff's job as including supervision of two individuals who, along with Plaintiff, as a group managed Defendant's servers and databases and provided desktop support that required physical work with equipment. *Id.* at 25 (depo. at 26-28). Plaintiff's job included meeting with clients to develop new software. *Id.* at 30 (depo. at 106-107). Finally, Mr. Archibeque and his subordinates, including Plaintiff, worked in the Apodaca Building. *Id.* at 12, ¶ 11. According to Defendant, this proximity in the Apodaca Building allowed IT staff to work together. *Id.*

Plaintiff maintains that his essential job function consisted solely of managing servers remotely and did not include physically working on equipment or supervising IT coworkers. Plaintiff's evidence for this definition of his essential job function is limited to his deposition testimony. (Doc. 101-1) at 7 (depo. at 109). Plaintiff does not provide corroborating evidence

that his job's essential functions did not include physically working on equipment and supervising other IT employees. Consequently, the Court concludes that Plaintiff has failed to show a genuine issue of material fact regarding whether an essential function of Plaintiff's job was physically working on equipment and supervising some of Defendant's IT employees. *See Mason*, 357 F.3d at 1121 (citing *Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000)) ("an employee's self-serving affidavit describing the essential functions of his position was, standing alone, insufficient to raise a genuine issue of material fact in light of the employer's overwhelming evidence to the contrary"). In other words, it is undisputed that Plaintiff's essential job functions included physically working on equipment and supervising his IT coworkers. Considering all of the evidence in the light most favorable to Plaintiff, a reasonable jury could find that Plaintiff's disability prevented him from performing the essential functions of his job, i.e., Plaintiff could not work on equipment in the basement nor could he physically supervise his IT coworkers if they worked in the basement. Thus, there is a genuine issue of material fact as to the first inquiry under the "otherwise qualified" analysis.

Defendant also argues that Plaintiff's statements in his PERA and SSA disability benefits applications show he was not qualified to perform the essential functions of his job. Defendant relies on *Chavez v. Qwest, Inc.*, 483 F. Supp. 2d 1103 (D.N.M. 2007), and *Kitchell v. Public Services Co.*, 1998-NMSC-051, 126 N.M. 525, to assert that because Plaintiff admitted he is no longer able to work in his PERA and SSA disability benefits applications he is unable to recover under the ADA or NMHRA for disability discrimination. However, the Court considers both *Chavez* and *Kitchell* factually distinguishable from the instant matter and, consequently, not persuasive. The employee in *Chavez* failed to present evidence showing she was "otherwise qualified" at the time of her termination. 483 F. Supp. 2d at 1113 (noting employee failed to

explain why she was otherwise qualified despite providing doctor letter stating she could not work and stating she could not work in disability application). Similarly, the employee in *Kitchell* admitted he was not "otherwise qualified." 1998-NMSC-051, ¶ 7 (emphasizing that employee represented during his employment his disability "prevented him from engaging, for remuneration or profit, in any occupation for which he is or becomes fitted by age, training, or experience.").

In contrast, Plaintiff's statements in his October 2014 PERA and December 2014 SSA disability applications show that he suffered from certain medical conditions but not that he was otherwise unable to perform his job on May 9, 2014, when Mr. Aguilar denied his request to move from Room 236. Additionally, the fact that SSA found Plaintiff to be disabled as of June 5, 2014, does not necessarily mean Plaintiff was not "otherwise qualified" when Mr. Aguilar denied his request in May 2014.

This leads to the second inquiry of the "otherwise qualified" question and third element of the *prima facie* case, whether Plaintiff requested a reasonable accommodation which would have allowed Plaintiff to perform his essential job functions. "Whether an accommodation is reasonable under the ADA is a mixed question of law and fact." *Mason*, 357 F.3d at 1122 (citing *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002)). Reasonable accommodation means "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). Such accommodations may include, but are not limited to "[m]aking existing facilities used by employees readily accessible to and usable by individuals with disabilities . . . [j]ob restructuring, . . . and other similar accommodations for individuals

with disabilities." *Id.* at § 1630.2(o)(2).  To determine "the appropriate reasonable accommodation," the employee and employer should engage in an interactive process, which "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* at § 1630.2(o)(3).

"In general, the interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations." *Smith*, 180 F.3d at 1171.  Once the employee provides notice to the employer, then "both parties have an obligation to proceed in a reasonably interactive manner" to determine a reasonable accommodation. *Id.* at 1172 (discussing reasonable reassignment opportunities).  "The exact shape of this interactive dialogue will necessarily vary from situation to situation and no rules of universal application can be articulated." *Id.* at 1173.

The Court finds that there is a genuine issue of material fact as to whether Defendant met its obligation of engaging in an interactive process regarding Plaintiff's April 21, 2014, request to move from Room 236.  Plaintiff's April 21, 2014, letter and Dr. Donovan's April 3, 2014, note put Defendant on notice that Room 236 was not meeting Plaintiff's medical needs and that another office with natural light and fresh air would be better.  (Doc. 89-8) at 4-5.  Moreover, Defendant has not provided evidence showing that it engaged with Plaintiff in pursuing another office in the Apodaca Building.

Defendant argues that it engaged in the interactive process by "constantly interact[ing] with [Plaintiff]" and providing him with "numerous accommodations."  (Doc. 114) at 28.  The Court recognizes that Defendant moved Plaintiff from the basement after the November 2010 incident, and then granted Plaintiff's requests to move into offices with access to fresh air through February 2014.  However, that was not the case after Plaintiff's move to the basement in

February 2014 and the subsequent move to Room 236 in March 2014, where Plaintiff did not have access to fresh air. A reasonable jury could find that Defendant failed to reasonably engage with Plaintiff in pursuing an accommodation that would have helped Plaintiff. Thus, Plaintiff has shown that there is a genuine issue of material fact as to whether Defendant failed to participate in the interactive process.

To succeed on the reasonable accommodation claim, Plaintiff also needs to show that a reasonable accommodation was possible. *Smith*, 180 F.3d at 1174 (noting even if defendant failed its interactive obligations, plaintiff must show reasonable accommodation possible). In determining what a reasonable accommodation is, the Tenth Circuit has "consistently held…that an employee's request to be relieved from an essential function of her position is not, as a matter of law, a reasonable or even plausible accommodation." *Mason*, 357 F.3d at 1122 (citing *Wells*, 228 F.3d at 1145). "[T]he ADA does not even require an employer to modify an essential function of an existing position in order to accommodate a disabled employee." *Id.* at 1123 (citation omitted).

Turning to whether a reasonable accommodation was possible, Defendant argues that a move to the North Building was not reasonable because Plaintiff would not be able to perform essential functions of his job from that location. (Doc. 114) at 25-27. As noted above, it is undisputed that Plaintiff's essential job functions included physically working on equipment and supervisory responsibilities over fellow IT coworkers. Hence, Plaintiff must show that he could physically work on equipment and supervise IT coworkers from the North Building. *See Smith v. Blue Cross Blue Shield of Kan., Inc.*, 102 F.3d 1075, 1076 (10th Cir. 1996) ("An accommodation that eliminates the essential function of the job is not reasonable.").

Viewing the evidence in the light most favorable to Plaintiff, Defendant had office space in the North Building and Plaintiff could perform his non-physical aspects of his job without having to work in the basement of the Apodaca Building. (Doc. 85-1) at 11-12, ¶¶ 4-5, 11; (Doc. 101) at 7, (depo. at 109). Plaintiff has failed, however, to provide evidence, other than his deposition testimony, that he could perform the essential functions of physically working on equipment and supervising other IT workers from the North Building.

At most, Plaintiff presents evidence that Mr. Aguilar supervised an employee stationed in the North Building while Mr. Aguilar was in the Apodaca Building. (Doc. 101-8) at 5 (depo. at 145). But evidence of Mr. Aguilar's ability to supervise an employee in another building does not demonstrate that Plaintiff could perform his supervisory responsibilities from the North Building. Thus, it appears that a move to the North Building would result in the elimination of Plaintiff's essential job function of supervising his IT coworkers. *Cf. Davidson*, 337 F.3d at 1192 ("We note that should a jury decide that voicephone experience is an essential function, the inquiry ends there, because the reasonable accommodation requested by [plaintiff] is to eliminate that essential function, which an employer is not required to do."). Therefore, as a matter of law, Plaintiff's request to move to the North Building was not reasonable. *See Mason*, 357 F.3d at 1122.

However, it appears that moving to another office in the Apodaca Building would have been a reasonable accommodation. Mr. Aguilar noted that if the May 2014 IME demonstrated a need to move Plaintiff from Room 236, Defendant would have continued doing what it had done since November 2010: provide Plaintiff with office space in the Apodaca Building, not located in the basement, and require other employees to move and work on equipment so that Plaintiff would not have to go into the basement. (Doc. 85-1) at 78-79 (depo. at 89-90).

Furthermore, Plaintiff has provided evidence that when provided with access to fresh air and natural light he was able to perform the essential functions of his job. Mr. Aguilar testified at his deposition that Plaintiff performed the essential functions of his job while in the third floor office and Room 205. *Id.* at 80 (depo. at 132-133). A reasonable jury could find that Plaintiff could perform the essential functions of his job if Defendant moved him to another office in the Apodaca Building with access to fresh air and natural light. Thus, Plaintiff has shown a genuine issue of material fact as to whether Defendant could have provided a reasonable accommodation in the Apodaca Building that would enable Plaintiff to perform the essential functions of his job. Therefore, Plaintiff has satisfied the third element of his *prima facie* case.

Defendant, however, does not need to provide a reasonable accommodation "if it would create an 'undue hardship.'" *Smith*, 180 F.3d at 1178 (citing 42 U.S.C. §§ 12112(5)(A), 12111(10)).

> "Undue hardship" means an action requiring significant difficulty or expense when considered in light of various factors. The factors to be considered in determining whether an accommodation would cause an employer undue hardship are, among others: the nature and cost of the accommodation; the number of persons employed by the company; the financial resources of the company; and the impact of the accommodation upon the operation of the company.

*Id.* (citation omitted). Whether there is an undue hardship is determined on a "case-by-case" basis. *Id.*

Defendant fails to show why a move within the Apodaca Building to a non-basement office with access to fresh air would be an undue hardship. Defendant fails to show that such a move would impose a significant difficulty or expense. By contrast, the Court notes that Defendant previously allowed Plaintiff to work in non-basement offices with access to fresh air without any apparent hardship to Defendant.

Therefore, the Court concludes Plaintiff has presented genuine issues of material fact regarding his *prima facie* case for failure to accommodate and Defendant has neither conclusively rebutted any element of Plaintiff's case nor shown an affirmative defense. Accordingly, the Court denies Defendant's request for summary judgment on Plaintiff's ADA and NMHRA failure to accommodate claims.

## B. Plaintiff's Common Law Claim for Constructive Discharge

Plaintiff does not allege in the Amended Complaint or clarify in the briefing that the constructive discharge claim arises under federal civil rights law. Therefore, the Court construes that claim as an independent state civil cause of action. However, *Gormley v. Coca-Cola Enters.*, expressly prohibits, as a matter of law, the use of constructive discharge as an "independent cause of action, such as a tort or a breach of contract." 2006-NMSC-003, ¶ 9, 137 N.M. 192. "Instead, constructive discharge is a doctrine that permits an employee to recast a resignation as a de facto firing, depending on the circumstances surrounding the employment relationship and the employee's departure." *Id.* (citations omitted). Accordingly, Defendant is entitled to summary judgment on Plaintiff's constructive discharge claim.

## C. Plaintiff's Claim of Sex Discrimination Under Title VII and NMHRA[10]

When a plaintiff alleges sex discrimination based on circumstantial evidence, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a *prima*

---

[10] The New Mexico Supreme Court has stated that "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA." *Ocana v. American Furniture Co.*, 2004-NMSC-018, ¶ 23, 135 N.M. 539 (citing *Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, ¶ 20, 129 N.M. 586) (applying Title VII case law in a sexual harassment claim under the NMHRA). Thus, the Court will apply Title VII law to both the Title VII and NMHRA sex discrimination claims.

*facie* case for sex discrimination. *PVNF, L.L.C.*, 487 F.3d at 800. "Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action.…If the employer does so, the burden shifts back to the plaintiff to show that there is a genuine issue of material fact as to whether the employer's proffered reasons are pretextual." *Id.* (citation omitted).

To establish a *prima facie* case of discrimination, Plaintiff must show "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005) (citing *Trujillo v. Univ. of Colorado Health Sciences. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998)). The parties do not dispute the first two elements of Plaintiff's *prima facie* case of discrimination. Consequently, the Court only considers whether Plaintiff meets the third element of his *prima facie* case: disparate treatment among similarly situated employees.

To be similarly-situated, the comparator employees must have had the same supervisor as the plaintiff and so were subjected to the same performance and disciplinary standards as the plaintiff. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.") (citation and quotation marks omitted). "Work histories, company policies applicable to the plaintiff and the comparator, and other relevant employment circumstances should be considered when determining whether employees are similarly-situated." *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005). In other words, a plaintiff must show that he was similarly-situated to the comparator employees "in all relevant respects." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). "Whether two employees are similarly situated ordinarily presents a question of fact for the

jury." *Ramirez v. The GEO Group, Inc.*, 655 F. Supp. 2d 1170, 1176 (D. Colo. 2009) (citing

*Riggs*, 497 F.3d at 1117) (quotations omitted).

Construed in the light most favorable to Plaintiff, his proffered evidence shows that three

of Defendant's female employees temporarily worked outside of their assigned offices during the

2013-2014 time period.  Plaintiff has not shown, however, that any of the three female

employees were IT personnel or were supervised by Mr. Archibeque, Plaintiff's immediate

supervisor.  Moreover, the circumstances surrounding the moves of the female employees are not

similar to Plaintiff's circumstances or his reasons for his request to move from Room 236.  For

example, Defendant moved Ms. Moorhouse only because of a medical concern, which in her

case was her asthma, and only for a temporary period.  As for Ms. Intriere, Defendant allowed

her to work from home because of personal concerns that were not related to any medical

conditions, unlike Plaintiff.  Finally, Ms. Stofocik only worked outside of the Apodaca Building

for a brief period and without Mr. Aguilar's permission.  Mr. Aguilar eventually denied Ms.

Stofocik's request to move out of the Apodaca Building.  A reasonable jury could not find from

the above evidence that Defendant treated Plaintiff differently from similarly situated female

employees.  Thus, Plaintiff fails to demonstrate the third element of a *prima facie* case of sex

discrimination under Title VII.  Accordingly, Defendant is entitled to summary judgment on

Plaintiff's Title VII and NMHRA sex discrimination claims.

### D. Plaintiff's Claim of Retaliation Under the NMWPA[11]

The *McDonnell Douglas* burden shifting analysis applies to retaliation claims under the

NMWPA.  *See Lobato v. New Mexico Environment Dept.*, 733 F.3d 1283, 1297 (10th Cir. 2013).

---

[11] The Court notes that Plaintiff fails to allege in his Amended Complaint or argue in his brief
that his purported constructive discharge constitutes an adverse employment action for purposes
of his NMWPA *prima facie* case.

To establish a *prima facie* case for retaliation, a "plaintiff must prove: (1) she engaged in a protected activity, (2) she was subject to adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action." *Gonzales v. New Mexico Dep't of Health*, 2000-NMSC-029, ¶ 22, 129 N.M. 586.

As to the first element of the *prima facie* case, the parties do not dispute that Plaintiff engaged in a protected activity. *See* (Doc. 87) at 15-16. The parties agree Plaintiff's affidavit in the CWA lawsuit in September 2013 is a communication protected under the NMWPA.

Turning to the second element of the *prima facie* case, a failure to accommodate an employee's disability may be considered an adverse employment action. *Cf. Roecker v. Brennan*, 2017 WL 445504, at *11 (D. Kan.); *see also St. Amour v. Lawrence & Memorial Corp.*, 2016 WL 4744120, at *8 (D. Conn.) (finding failure to accommodate plaintiff's disability can be considered adverse employment action). As described above, the record contains evidence that would allow a reasonable jury to find that Defendant failed to accommodate Plaintiff's disabilities. Therefore, Plaintiff meets the second element of his *prima facie* case.

Regarding the third element, "a causal connection may be shown by 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *Id.* "The fact-finder should be free to consider timing and proximity, along with all the other facts and circumstances, in deciding the ultimate issue of causation." *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 22, 139 N.M. 12.

Plaintiff fails to point to a temporal connection or proximity between his September 2013, affidavit and the refused accommodation in May 2014. At most, Plaintiff has shown conflicting statements about who would make the decision regarding his April 21, 2014, request to move from Room 236. Mr. Giles told Plaintiff that Defendant's General Counsel and NMRMD would decide his request. However, Mr. Aguilar later testified that he did not consult either Defendant's General Counsel or NMRMD, and that he did not take Plaintiff's PTSD seriously. (Doc. 102-5) at 3 (depo. at 60). While the inconsistency between Mr. Giles' statement to Plaintiff and Mr. Aguilar's testimony is perplexing, without any other evidence of animus a reasonable jury could not infer that Mr. Aguilar's actions were retaliatory and, thus, causally connected to the CWA affidavit. Therefore, Plaintiff fails to establish the third element of his *prima facie* case of retaliation.

In any event, assuming *arguendo* Plaintiff established a *prima facie* case, he still must show that Defendant's reason for refusing to move him to the North Building was pretextual. "A plaintiff can show pretext by revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). Mr. Aguilar's May 9, 2014, letter indicated it was not operationally feasible for Defendant to move Plaintiff to the North Building. The evidence shows that Plaintiff could not perform all of the essential functions of his job at the North Building. Plaintiff has not provided any evidence from which a reasonable jury could find pretext. Accordingly, Defendant is entitled to summary judgment on Plaintiff's NMWPA retaliation claim.

### E.  *Plaintiff's Duty to Mitigate Damages*

Generally, a plaintiff in employment cases "has a duty to mitigate his damages, presumably by seeking employment elsewhere."  *See Whatley v. Skaggs Companies, Inc.*, 707 F.2d 1129, 1138 (10th Cir. 1983) (citing *United States v. Lee Way Motor Freight*, 625 F.2d 918, 936-938 (10th Cir. 1979)); *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 141 (1st Cir. 2009) ("A victim of employment discrimination ordinarily has the duty to mitigate damages by seeking alternative employment.").  "Further, mitigation requires not success in finding alternate employment, but only a reasonable exertion to mitigate damages."  *Whatley*, 707 F.2d at 1138 (citing *Lee Way*, 625 F.2d at 937).  Courts have found that "the employer may be held responsible for the entire amount of lost salary notwithstanding the employee's failure to obtain another job if the employer's unlawful conduct caused the employee's inability to mitigate damages."  *Tobin*, 553 F.3d at 141 (citation and internal quotation marks omitted) ("In other words, if an employee is unable to work because of a disability 'caused' by the employer, the employee may obtain compensation for the resulting pay.").

The Court denies Plaintiff's Motion for Partial Summary Judgment for two reasons. First, the Court cannot rule that Plaintiff had no duty to mitigate damages by seeking other employment without first obtaining a determination on whether Plaintiff had a qualifying disability.  As shown above, there is a genuine issue of fact whether Plaintiff is disabled, which is left for the fact finder to decide.  Second, assuming Plaintiff has provided sufficient evidence of his mental disability, a reasonable jury may not necessarily find that Defendant "caused" his disability.  For these reasons, Plaintiff's Motion for Partial Summary Judgment is premature. Accordingly, Plaintiff is not entitled to summary judgment on his duty to mitigate damages.

*V. Conclusion*

For all the above reasons, the Court grants, in part, and denies, in part, Defendant's First Motion for Summary Judgment; grants Defendant's Second Motion for Summary Judgment; and denies Plaintiff's Motion for Partial Summary Judgment. In sum, only the ADA and NMHRA failure to accommodate claims survive summary judgment.

IT IS, THEREFORE, ORDERED that

1. Defendant's First Motion for Summary Judgment (Doc. 84) is granted, in part, and denied, in part;

2. summary judgment will be entered in Defendant's favor on Count V of Plaintiff's Amended Complaint;

3. Count V of the Amended Complaint will be dismissed with prejudice;

4. Defendant's Second Motion for Summary Judgment (Doc. 86) is granted;

5. summary judgment will be entered in Defendant's favor on Count II of Plaintiff's Amended Complaint;

6. Count II of the Amended Complaint will be dismissed with prejudice;

7. summary judgment will be entered in Defendant's favor on the NMHRA sex discrimination claim in Count III of the Amended Complaint;

8. the NMHRA sex discrimination claim in Count III of the Amended Complaint will be dismissed with prejudice;

9. summary judgment will be entered in Defendant's favor on Count IV of Plaintiff's Amended Complaint; and

10. Count IV of the Amended Complaint will be dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE